1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                          **DISTRICT OF NEVADA**
6                                   * * *
7    VANESSA DOUGLAS, SANDRA              Case No. 2:13-cv-02326-RFB-PAL
     HENDERSON, ,
8                                                        ORDER
                        Plaintiffs,
9
          v.
10
     JOHN E. STALMACH, *et al*.,
11
                        Defendants.
12
13
14   **I.      INTRODUCTION**
15          This case is before the Court on two Motions for Summary Judgment, one filed by
16   Defendant Clark County School District and one filed by Defendant Bambi Dewey. ECF Nos. 91,
17   94. For the reasons stated below the Court grants in part and denies in part Defendant Clark
18   County's Motion (ECF No. 91) and denies Defendant Dewey's Motion (ECF No. 94).
19
20   **II.     BACKGROUND**
21          Plaintiffs Vanessa Douglas and Sandra Henderson filed their initial Complaint on
22   December 23, 2013. ECF No. 1. Following several extensions of discovery, Plaintiffs filed their
23   Second Amended Complaint on August 24, 2015, which is the operative complaint in this action.
24   ECF No. 90.
25          On September 14, 2015, Defendants Clark County School District (CCSD) and Bambi M.
26   Dewey each filed Motions for Summary Judgment. ECF Nos. 91, 94. The Court held a hearing on
27   March 30 and again on March 31, 2016 regarding these motions. ECF Nos. 106, 107.
28

The remaining defendant, John Stalmach, was served with the Amended Complaint on September 2, 2015 but has not filed or joined in any dispositive motions. ECF No. 103.

In the Second Amended Complaint, Plaintiffs Vanessa Douglas and Sandra Henderson allege that Defendants Bambi Dewey and John Stalmach sexually abused Vanessa and that CCSD was deliberately indifferent to the risk of teacher-student harassment and abuse in its schools.

Vanessa asserts seven causes of action in the Second Amended Complaint: 1) Violation of Title IX, 20 U.S.C. § 1681(a), against CCSD; 2) Negligence against CCSD; 3) Fourteenth Amendment Due Process claim against CCSD; 4) Fourteenth Amendment Equal Protection claim against CCSD; 5) Assault against Mr. Stalmach and Ms. Dewey; 6) Battery against Mr. Stalmach and Ms. Dewey; and 7) Intentional Infliction of Emotional Distress against Mr. Stalmach and Ms. Dewey. Plaintiff Sandra Henderson joined in the seventh cause of action for intentional infliction of emotional distress.

However, in Plaintiffs' response brief to Ms. Dewey's Motion for Summary Judgment, Ms. Henderson agreed to voluntarily dismiss her IIED claim. The Court agrees to allow the dismissal of this claim. Therefore, Vanessa is the only Plaintiff asserting claims in this case.

## III.    LEGAL STANDARD

### A.  Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

## IV.   UNDISPUTED FACTS

After reviewing the evidence submitted by the parties and the documents in the record, the Court finds the following undisputed facts.

### A.  Relationship Between Ms. Douglas, Mr. Stalmach, and Ms. Dewey

Vanessa Douglas grew up in Henderson, Nevada and attended public schools within CCSD.

#### *1. 7th Grade (2007-08)*

The 2007-08 school year was Vanessa's 7th grade year. During this year, Vanessa attended Brown Junior High School. During this year, Mr. Stalmach was employed at Brown as a licensed physical education teacher. Mr. Stalmach also coached the girls' basketball team.  During this year, Ms. Dewey was employed at Brown as a licensed reading teacher. Ms. Dewey also was an assistant coach for the girls' basketball team. At all times relevant to this case, Mr. Stalmach and Ms. Dewey were engaged in a romantic relationship.

Vanessa met Mr. Stalmach and Ms. Dewey during her 7th grade year at Brown. Ms. Dewey was Vanessa's reading teacher during this year. Vanessa met Mr. Stalmach through her involvement with the cheerleading squad, which traveled to basketball games with Mr. Stalmach's team. The cheerleading squad and girls' basketball team practiced at the same time. Vanessa would frequently talk with Mr. Stalmach and Ms. Dewey after practice.

Near the end of Vanessa's 7th grade year at Brown, Mr. Stalmach and Ms. Dewey asked Vanessa and several of her female friends to babysit Ms. Dewey's children. Vanessa and two of her friends began regularly going to Ms. Dewey's home, where she lived with Mr. Stalmach, and babysitting Ms. Dewey's children.

#### *2.  8th Grade (2008-09)*

By the time Vanessa began her 8th grade year at Brown, Mr. Stalmach had been transferred

to Basic High School in Henderson. Ms. Dewey was still teaching at Brown, but was no longer Vanessa's teacher.

In 8th grade, Vanessa and her two friends continued to babysit for Ms. Dewey and began staying the night at Ms. Dewey's and Mr. Stalmach's house on weekends. Vanessa's mother gave her permission to sleep over, but Vanessa did not tell anyone else at school that she was sleeping over because she didn't feel it was necessary.

### 3. 9th Grade (2009-10)

In 9th grade, Vanessa attended Basic High School, where Mr. Stalmach was teaching, and continued to babysit and spend weekends at Ms. Dewey's and Mr. Stalmach's house. Vanessa did not have any classes with Ms. Dewey or Mr. Stalmach.

She continued to see Mr. Stalmach and Ms. Dewey at their house on weekends, and also would talk to Ms. Dewey at Brown Junior High when she came by to pick up her brother.

Vanessa would also spend time with Ms. Dewey and Mr. Stalmach at Basic football and basketball games.

### 4. 10th Grade (2010-11)

In 10th grade, Vanessa was still attending Basic High School. Mr. Stalmach was now teaching at Dailey Elementary School. Mr. Bechtel called and spoke to the Dailey Principal and informed the Principal of Stalmach's disciplinary issues. When Stalmach moved into his classroom at the elementary school, he brought Vanessa with him to the school and introduced her to the Principal. The Principal did not inquire into their interaction or relationship, and the Principal did not follow up on this incident in any way.

During this time, Ms. Dewey was still teaching at Brown. Vanessa continued to stay regularly at Mr. Stalmach's and Ms. Dewey's house on weekends. During Vanessa's tenth grade year, Mr. Stalmach and Ms. Dewey began giving Vanessa alcohol.

### 5. 11th Grade (2011-12)

In 11th grade, Vanessa continued sleeping over at Mr. Stalmach's and Ms. Dewey's house. Mr. Stalmach and Ms. Dewey continued giving Vanessa alcohol and drinking with her and her

friends. They also began smoking marijuana with Vanessa. In 11th grade, Vanessa began sleeping in the same bed with Mr. Stalmach and Ms. Dewey.

### a. Sexual Incident

On approximately December 23, 2011, Vanessa was at Mr. Stalmach's and Ms. Dewey's house. Ms. Dewey invited Vanessa to take shots of whisky with her. Vanessa consumed approximately eight shots of whisky. Mr. Stalmach then entered the room and asked them if they wanted to smoke marijuana. All three then smoked marijuana together. Mr. Stalmach then kissed Ms. Dewey, and then kissed Vanessa. All three individuals then had sex with one another.

The next morning, Ms. Dewey and Mr. Stalmach drove Vanessa home and told her not to tell anyone, or they would lose their jobs. In January of 2012, Vanessa had sex with Mr. Stalmach one additional time.

**B. CCSD's Investigation of Mr. Stalmach's Conduct**

During the 2007-08 school year (Vanessa's 7th grade year), the assistant principal at Brown Junior High School noticed that Mr. Stalmach always had "girls hanging around." The assistant principal did not observe any touching or inappropriate physical contact between the girls and Mr. Stalmach, but "had a bad feeling" about Mr. Stalmach's relationship with female students. The assistant principal had two "knock it off conversations" with Mr. Stalmach about his relationships with female students. Mr. Stalmach did not receive any formal discipline, admonishment, or notations in his personnel file arising from these incidents.

At the end of the 2007-08 school year, CCSD transferred Mr. Stalmach to Basic High School.

On February 4, 2009, an assistant principal at Basic was informed of allegations that Mr. Stalmach had driven several female students to a Denny's restaurant after school the day before, eaten with them, and driven them home, all without parental permission. The assistant principal held an investigatory conference with Mr. Stalmach on February 5, 2009. Mr. Stalmach denied taking the students to Denny's, but stated that he had taken two students to dinner at a restaurant during the previous school year and had driven students home after games. Mr. Stalmach stated that he was not aware that it was against CCSD policy to accompany, meet, or drive a student at

any time. The assistant principal ordered Mr. Stalmach to refrain from (1) accompanying or meeting students off campus for any reason other than school-related activities or business, and (2) allowing students to ride in his car to any destination. Mr. Stalmach was also directed to conduct himself in a professional manner at all times and seek administrative clarification if he failed to understand the directions.

In October 2009, the parents of a female Basic student in the 9th grade ("MJ") learned that Mr. Stalmach had been permitting MJ to skip one of her assigned classes and stay in his classroom. After meeting with Mr. Stalmach, MJ's parents were suspicious. They reviewed MJ's cell phone and found a number of text messages between MJ and Mr. Stalmach. MJ states that she did not know how Mr. Stalmach obtained her cell phone number. He began texting her in the fall of 2009, and over time he began texting her about spending time together outside of school.  For example, the text messages contain the following exchanges:

**Stalmach:**     Y' wus goin' on?

**M.J:**     Homecoming!

**Stalmach:**     oh ya im dumb na I wont b thr nobody asked me 2 go ☹

**M.J.:**      I did :/

**Stalmach:**     Ya right u wudda just stood me up!

**M.J.:**     NOOOOO I don't have a date :/

**Stalmach:**     I cnt believe u don't have a date!

**M.J.:**     Your my date, that's stood me up! :/

**Stalmach:**     U wuldnt want 2 go wit me I don't dance and the after part wud b at the gym!

**M.J.:**     Ahahahha (: nice

**Stalmach:**     Whud u end up doin lstnite?

**M.J:**     I went to the dance! ( nwent to a party for a few, then went to 7hills cause my parents were having a party at our haouse! ☺ lol

**Stalmach:**     Damn party grl mayb I shudda hung wit ulstnite!

**M.J.:**     Well you thought I would of stood you up! :/

- 6 -

1    **Stalmach**:        U prally wuddda got drunk nd abused me anyway I kno ur type grrrly.

2        On October 15, 2009, MJ's father met with Basic High School Principal David Bechtel

3    and another administrator. MJ's father gave the administrators MJ's phone and told them that he

4    thought the text messages were grossly inappropriate and highly concerning. MJ's father also told

5    the administrators that Mr. Stalmach had shown MJ a picture of a penis with herpes on it. Finally,

6    MJ's father told the administrators that he thought Mr. Stalmach's attempts to spend time with MJ

7    outside of school were done to groom and cultivate a sexual relationship with her. The Basic

8    administrators told MJ's father that they would conduct an investigation of Mr. Stalmach.

9        CCSD referred the investigation to the CCSD Police Department, notified Mr. Stalmach of

10   the allegations against him, removed him from the classroom, and assigned him to "home" pending

11   an investigation. CCSD police took photos of the text messages, but did not conduct a forensic

12   examination of MJ's phone to determine if any messages or pictures had been deleted. Based upon

13   this review, CCSD police concluded on October 17, 2009 that, based on the text messages

14   themselves, no criminal activity was taking place. CCSD police also conducted a check on

15   Myspace and Facebook, and no accounts were found for MJ or Mr. Stalmach. CCSD police also

16   confiscated the hard drive of Mr. Stalmach's work computer for forensic investigation. CCSD

17   Police completed their forensic investigation of Mr. Stalmach's work computer on November 6,

18   2009. The investigation revealed five "suspect images" and five text fragments. The images appear

19   to be of students or young people, approximately of high school age, posing for photos in various

20   stages of undress. The investigator concluded that all images and text fragments were in

21   compliance with CCSD's acceptable use policy. CCSD Police did not interview MJ, her parents,

22   Mr. Stalmach, or anyone else. On November 12, 2009, CCSD Police concluded that none of the

23   text messages or pictures were criminal in nature, closed the case, and stated that the case "can be

24   handled administratively."

25       CCSD held an investigatory conference with Mr. Stalmach in December 2009. Mr. Bechtel

26   and Molly Lyman, Director of CCSD Employee Management Relations, were present at the

27   conference. Bechtel and Lyman did not believe everything Mr. Stalmach said at the hearing with

28   respect to how much communication he was having with MJ. Immediately after the conference,

Bechtel and Lyman decided to attempt to obtain Mr. Stalmach's phone records, and were told by Mr. Stalmach's cell phone service provider that this required a subpoena. Mr. Stalmach informed CCSD that he would request the phone records. Mr. Stalmach provided written consent to Sprint to release text message details from his cell phone on February 2, 2010. On February 3, 2010, Ms. Lyman contacted the assistant principal at Brown Junior High, who informed her of his "bad feeling" about Mr. Stalmach and his two "knock it off" conversations while Mr. Stalmach was employed at Brown. On February 26, 2010, Basic administrators contacted Mr. Stalmach to verify that he had submitted the request for phone records. Mr. Stalmach told them he had submitted the request and was expecting the records soon. On February 15, 2010, Sprint sent the requested records for Mr. Stalmach's cell phone. The date range for the records was from November 17, 2009 to February 2, 2010. This date range began more than a month *after* MJ's father met with Basic administrators to alert them to Mr. Stalmach's text messages with his daughter. Sprint's consent form states that text message details are only available for the most recent 90 day period. The text messages received from Sprint revealed that Mr. Stalmach and MJ had corresponded in hundreds of text messages. During the course of their investigation, no one at CCSD contacted or interviewed MJ or her parents. Had they spoken with MJ, she likely would have informed them that she did not know how Mr. Stalmach obtained her cell phone number, that Mr. Stalmach routinely socialized with Basic girls outside of school and invited them to his house, that Mr. Stalmach would often tell MJ that she looked cute and compliment her breasts and legs, and that she believed Mr. Stalmach was attempting to pursue a physical relationship with her and had done so with other girls at Basic. However, on October 24, 2009, Mr. Bechtel received a statement from another Basic student stating that the student had heard that MJ would hang out in Mr. Stalmach's room and that he would comment on her breasts.

In April or May of 2010, CCSD determined that there was "not enough" to dismiss Mr. Stalmach. CCSD then began drafting a formal admonition. CCSD believed that it "more than likely would have lost in arbitration" if it had fired Mr. Stalmach, because he did not have a formal admonition on his record. Upon learning that Mr. Stalmach would be returning to CCSD, Mr. Bechtel informed his supervisors that Mr. Stalmach "absolutely could not come back" to Basic.

CCSD issued a formal admonition to Mr. Stalmach on May 26, 2010. The admonition stated that Mr. Stalmach's conduct constituted grounds for disciplinary action "within the scope and intent of NRS 391.312 (a) inefficiency; (c) unprofessional conduct (e) neglect of duty; (i) inadequate performance; (k) failure to comply with such reasonable requirements as a board may prescribe." Mr. Stalmach was suspended for 20 days. Mr. Stalmach was also directed to: 1) comply with all previous directives; 2) maintain professional relationships with students, staff, and parents; 3) not provide, under any circumstances, his personal cell phone number or email address to a CCSD student; 4) not respond, under any circumstances, to any text messages or emails sent by CCSD students; 5) not engage, under any circumstances, with any CCSD student on a telephone outside of his work location; and 6) immediately report any violation of these directives to his supervising administrator. Mr. Stalmach was informed that any recurrence of these incidents could result in further disciplinary action, including suspension or dismissal or non-reemployment. Mr. Stalmach was then administratively transferred to Dailey Elementary School for the 2010-2011 school year. The administration at Dailey had access to Mr. Stalmach's formal admonishment document.

Mr. Stalmach was arrested in September 2012. Ms. Lyman, Director of CCSD's Employee Management Relations department who conducted the initial investigatory conference,, was not surprised at the allegation that Mr. Stalmach had had sex with a student, testifying that she "knew the guy would be coming back on the radar." After learning of his arrest, CCSD waited until it received the police report and then held another investigatory conference with Mr. Stalmach. CCSD informed Mr. Stalmach that he was going to be dismissed, but that he could resign at any time before the dismissal was processed. Mr. Stalmach then resigned from employment with CCSD.

## V.      CCSD's Motion for Summary Judgment (ECF No. 91)

Plaintiff alleges the following claims against Defendant CCSD: 1) Violation of Title IX, 20 U.S.C. § 1681(a); 2) Negligence; 3) Fourteenth Amendment Due Process; and 4) Fourteenth

1    Amendment Equal Protection. The Court addresses each below, addressing Plaintiff's Fourteenth

2    Amendment claims together.

3              **A. Title IX Claim**

4                   *1. Legal Standard*

5         "Title IX provides that no person 'shall, on the basis of sex . . .  be denied the benefits of,

6    or be subjected to discrimination under any education program or activity receiving Federal

7    financial assistance.'" Oden v. N. Marianas College, 440 F.3d 1085, 1088 (9th Cir. 2006) (quoting

8    20 U.S.C. § 1681(a)). Congress enacted Title IX in 1972 with two principal objectives in mind:

9    [1] to avoid the use of federal resources to support discriminatory practices and [2] to provide

10   individual citizens effective protection against those practices." Gebser v. Lago Vista Indep. Sch.

11   Dist., 524 U.S. 274, 286 (1998) (internal quotation marks omitted). "[W]hereas Title VII aims

12   centrally to compensate victims of discrimination, Title IX focuses more on 'protecting'

13   individuals from discriminatory practices carried out by recipients of federal funds." Gebser, 524

14   U.S. at 287.

15        Damages are available under Title IX where "an official who at a minimum has authority

16   to address the alleged discrimination and to institute corrective measures on the recipient's behalf"

17   has (1) "actual knowledge of discrimination in the recipient's programs" and (2) responded with

18   deliberate indifference to the discrimination. Gebser, 524 U.S. at 290. In Gebser, the Court rejected

19   a theory of liability premised on "principles of *respondeat superior* or constructive notice," instead

20   requiring actual notice to an official with authority. Gebser, 524 U.S. at 285. "Discrimination" in

21   the context of Title IX encompasses sexual harassment and abuse of a student by a teacher. "Title

22   IX place[s] on [public school systems] the duty not to discriminate on the basis of sex, and when

23   a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor

24   "discriminates" on the basis of sex. We believe the same rule should apply when a teacher sexually

25   harasses and abuses a student. Congress surely did not intend for federal moneys to be expended

26   to support the intentional actions it sought by statute to proscribe." Franklin v. Gwinnett County

27   Pub. Sch., 503 U.S. 60, 75 (1992).

28

1        The Court is not aware of any Supreme Court or Ninth Circuit case that has elaborated on

2    the contours of the "actual knowledge" requirement announced in <u>Gebser</u>. The Court finds, in

3    accordance with multiple district courts across the country, that a Title IX recipient has actual

4    knowledge when an appropriate official has actual notice of a substantial risk of abuse to students

5    based on prior complaints by the same, or other, students. <u>See, e.g.</u>, <u>Doe A. v. Green</u>, 298

6    F.Supp.2d 1025, 1033-34 (D. Nev. 2004) (collecting cases); <u>See also</u> <u>Johnson v. Galen Health</u>

7    <u>Institutes, Inc.</u>, 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003) ("Consistent with the majority of other

8    courts, the Court thus finds that the actual notice standard is met when an appropriate official has

9    actual knowledge of a substantial risk of abuse to students based on prior complaints by other

10   students."); <u>See also</u> <u>Crandell v. N.Y. College of Osteopathic Med.</u>, 87 F.Supp.2d 304, 320

11   (S.D.N.Y.2000) ("[T]he institution must have actual knowledge of at least some incidents of

12   harassment in order for liability to attach . . . [and must have] possessed enough knowledge of the

13   harassment that it reasonably could have responded with remedial measures to address the kind of

14   harassment upon which plaintiff's legal claim is based."); <u>See also</u> <u>Gordon ex rel. Gordon v.</u>

15   <u>Ottumwa Community Sch. Dist.</u>, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000) ("[A]ctual notice

16   requires more than a simple report of inappropriate conduct on the part of a school employee[,]

17   but the . . . standard does not set the bar so high that a school district is not put on notice until it

18   receives a clearly credible report of sexual abuse from the plaintiff-student. At some point between

19   these poles a supervisory school official knows, or it should be obvious to him or her, that a school

20   employee is a substantial risk to sexually abuse children.") (citation and internal quotation marks

21   omitted); <u>See also</u> <u>Massey v. Akron City Bd. of Educ.</u>, 82 F. Supp. 2d 735, 744 (N.D. Ohio 2000)

22   ("For actual notice to exist, an agent of the school must be aware of facts that indicate a likelihood

23   of discrimination.").

24       The test for deliberate indifference under Title IX is "whether a reasonable factfinder could

25   conclude that the [recipient's] response was clearly unreasonable in light of the known

26   circumstances." <u>Oden v. N. Marianas College</u>, 440 F.3d 1085, 1089 (9th Cir. 2006) (internal

27   quotation marks omitted). "In other words," the inquiry focuses on "whether . . . one could find

28   that the [school district] made 'an official decision . . . not to remedy the violation." <u>Oden</u>, 440

F.3d at 1089 (quoting <u>Gebser</u>, 524 U.S. at 290). "Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." <u>Gebser</u>, 524 U.S. at 290-91.

### 2. Analysis

Defendant CCSD first argues that there is no evidence suggesting that CCSD had actual notice of sexual abuse by Dewey or Stalmach. Relatedly, Defendant CCSD argues that constructive notice of abuse is insufficient to impose liability on the district and therefore CCSD cannot be held liable for damages under §1681. Second, Defendant argues that CCSD's response to complaints involving Stalmach unrelated to sexual abuse demonstrate that CCSD was not deliberately indifferent to the rights of its students.

In response, Plaintiff argues that the question of whether Defendant had "actual notice" and "deliberate indifference" is a question of fact for the jury, such that summary judgment is inappropriate.

### i. <u>A Reasonable Jury Could Find that Defendant Had Actual Notice</u>

First, the Court finds that a reasonable jury could find that Defendant CCSD had actual notice of Stalmach's harassment of female students by virtue of the two "knock it off" conversations in 2007 regarding his relationships with female students, as well as the text messages discovered between Stalmach and MJ in October 2009. For example, the text messages between Stalmach and MJ included the following exchange:

**Stalmach:**   Whud u end up doin lstnite?

**M.J:**   I went to the dance! (nwent to a party for a few, then went to 7hills cause my parents were having a party at our haouse!   ☐ lol

**Stalmach:**   Damn party grl mayb I shudda hung wit ulstnite!

**M.J.:**   Well you thought I would of stood you up! :/

**Stalmach**:   U prally wuddda got drunk nd abused me anyway I kno ur type grrrly.

Second, the Court finds that a reasonable jury could find that Defendant had actual notice of Stalmach's substantial risk of abuse. Defendant argues that the alleged warning signs that

Plaintiff points to are insufficient to rise to the level of actual knowledge of substantial risk of abuse. The Court disagrees. Based on the record before it, the Court finds that Defendant was repeatedly notified and aware of Coach Stalmach's alleged pattern of sexual harassment of young women beginning in 2007 until he resigned in 2012 and therefore had actual notice of a substantial risk of abuse based on prior complaints as required under Title IX. See Section IV(B) CCSD's Investigation of Mr. Stalmach's Conduct, supra. The assistant principal of Brown Junior High School had two "knock it off conversations" with Mr. Stalmach about his relationships with female students beginning in the 2007-2008 schoolyear. In February 2009, Mr. Stalmach was ordered by the assistant principal of Basic High School from refraining from certain interactions with students outside school-related activities. Later that year in October 2009, the parents of a Basic student in ninth grade, MJ, learned that Mr. Stalmach had repeatedly sent what they felt to be inappropriate text messages to their daughter and another investigation was conducted in November, though the case was closed. MJ did not know how Mr. Stalmach obtained her cell phone number. In April or May 2010, CCSD declined to dismiss Mr. Stalmach and instead formally admonished him. Mr. Stalmach did not resign from employment under September 2012, after he was arrested.

Therefore, the Court finds that a reasonable juror could find that Defendant CCSD did have actual notice of Stalmach's harassment as well as actual notice of substantial risk of abuse.

### ii. **A Reasonable Juror Could Find that CCSD's Failure To Effectively Address the Repeated Complaints Concerning Mr. Stalmach Indicates That Its Actions Were Clearly Unreasonable**

As previously stated, the test for deliberate indifference under Title IX is "whether a reasonable factfinder could conclude that the [recipient's] response was clearly unreasonable in light of the known circumstances." Oden, 440 F.3d at 1089 (internal quotation marks omitted). Defendant argues that CCSD was not deliberately indifferent to the warning signs in question because CCSD investigated and responded to every report made against Stalmach and provided verbal coaching, written direction, and levied serious discipline when they learned he was texting a student.

The Court disagrees. First, a reasonable juror could find that Defendant CCSD failed to maintain a method of tracking information—particularly verbal warnings—that would have alerted the primary, middle, and high schools in the school district as to Stalmach's history of with female students. See March 30, 2016 Tr. at pp. 10-11. As a result, Stalmach's history was not thoroughly documented and school officials at the different schools involved were unaware of the various incidents that occurred. A reasonable juror could find that Defendant subsequently, and inappropriately, transferred Stalmach to other schools within the district rather than disciplining him. For example, CCSD transferred Stalmach from a middle school to high school, where he was able to maintain relationships with previous female students such as Vanessa; failed to issue formal admonitions as a result of the incomplete file; and ultimately declined to terminate Stalmach.

Second, a reasonable juror could find that Defendant CCSD failed to conduct a thorough investigation into complaints against Stalmach, which may have more clearly alerted Defendant to the take more severe disciplinary action against Stalmach earlier on, preventing him from engaging in inappropriate relationships with student such as Plaintiff. For example, a reasonable juror could find that CCSD failed to conduct a thorough investigation in December 2009 regarding female student MJ. Specifically, a reasonable juror could find the investigation lacking by virtue of CCSD's failure to obtain the phone records of the text messages between Stalmach and MJ in a timely fashion, or its failure to contact or interview MJ or her parents. In fact, the Court finds that the such an interview would have informed CCSD that MJ did not know how Mr. Stalmach obtained her cell phone number, that Stalmach routinely socialized with female students outside of school and invited them to his house, that Mr. Stalmach would often tell MJ that she looked cute and compliment her breasts and legs, and that she believed Mr. Stalmach was attempting to pursue a physical relationship with her and had done so with other girls at Basic.

Therefore, the Court denies summary judgment as to Plaintiff's Title IX claim.

**B.  Section 1983 Claims (Due Process and Equal Protection)**

*1. Legal Standard*

"To impose municipal liability under § 1983 for a violation of constitutional rights plaintiff

must show: '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and, (4) that the policy is the 'moving force behind the constitutional violation.'" Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997) (internal citations omitted). Municipalities may not be held liable under a theory of *respondeat superior*. Monell v. N.Y. City Dept. of Social Servs., 436 U.S. 658, 690 (1978).

A municipality is liable under Section 1983 "if the individual can establish that the local government had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered." Whitaker v. Garcetti, 486 F.3d 572, 581 (9th Cir. 2007). In other words, "the identified deficiency in a city's [] program must be *closely related to the ultimate injury*." Oviatt By & Through Waugh v. Pearce, 954 F.2d 1470, 1481 (9th Cir. 1992) (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)) (emphasis in the original).

"[A] policy is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Oviatt By & Through Waugh v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official— even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." Pembaur v. City of Cincinnati, 475 U.S. 469, 481-83 (1986).

"Relying on the language of § 1983, the [Supreme] Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir.

1   1996), holding modified on other grounds by <u>Navarro v. Block</u>, 250 F.3d 729 (9th Cir. 2001).

2   "[P]roof of random acts or isolated events are insufficient to establish custom. . . . Only if a plaintiff

3   shows that his injury resulted from a 'permanent and well-settled' practice may liability attach for

4   injury resulting from a local government custom." <u>Los Angeles Police Protective League v. Gates</u>,

5   907 F.2d 879, 890 (9th Cir. 1990).

6         In this case, Plaintiff raises two claims under Section 1983 against Defendant CCSD: one

7   claim for violation of substantive due process, and another under equal protection. "Substantive

8   due process forbids the government from depriving a person of life, liberty, or property in such a

9   way that shocks the conscience or interferes with the rights implicit in the concept of ordered

10  liberty." <u>Corales v. Bennett</u>, 567 F.3d 554, 568 (9th Cir. 2009) (internal quotations and citations

11  omitted). The Ninth Circuit has held that a student has "a constitutional right to be free from state-

12  imposed violations of bodily integrity. This includes freedom from excessive physical abuse by

13  school employees. Although this court has never explicitly stated that this liberty interest includes

14  the right to be free from sexual abuse by school employees, a student's liberty interest in bodily

15  integrity logically encompasses such freedom." <u>Plumeau</u>, 130 F.3d at 439.

16        The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall

17  deny to any person within its jurisdiction the equal protection of the laws, which is essentially a

18  direction that all persons similarly situated should be treated alike." <u>Lee v. City of Los Angeles</u>,

19  250 F.3d 668, 686 (9th Cir.2001) (quoting <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432,

20  439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)) (internal quotation marks omitted). Plaintiffs alleging

21  such claims under Section 1983 "must show that actions of the defendants had a discriminatory

22  impact, and that defendants acted with an intent or purpose to discriminate based upon plaintiffs'

23  membership in a protected class." <u>The Comm. Concerning Cmty. Improvement v. City of</u>

24  <u>Modesto</u>, 583 F.3d 690, 702–03 (9th Cir. 2009) (internal citation omitted). <u>See also</u> <u>Reese v.</u>

25  <u>Jefferson Sch. Dist. No. 14J</u>, 208 F.3d 736, 740 (9th Cir. 2000) ("[t]o succeed on a § 1983 equal

26  protection claim, the plaintiffs must prove that the defendants acted in a discriminatory manner

27  and that the discrimination was intentional.").

28

2.   *Analysis*

In its Motion for Summary Judgment, Defendant does not argue that 1) Plaintiff does not have a liberty interest in being free from sexual abuse by Stalmach or 2) Plaintiff cannot show that Defendant's actions had a discriminatory impact or that it acted with an intent or purpose to discriminate based on Plaintiff's gender. Rather, Defendant argues that that summary judgment is appropriate because CCSD does not have a policy or practice that was the moving force behind Plaintiff's constitutional violation.

The Court finds that a reasonable juror could find that CCSD had policies or customs of a.) failing to have clear system for requiring principals to document conversations with teachers about possible inappropriate interactions with minors; b.) failing to have a uniform tracking system of information regarding inappropriate contact so that future schools would have to review and be aware of previous incidents; c.) failing to have a robust system of investigation beyond a simply review for criminal conduct of alleged inappropriate incidents; and d.) failing to create a overall system whereby officials in CCSD not connected with a specific school would be responsible for viewing and acting upon an employee's conduct that spanned several different schools.  See Section V(A)(2) supra. Therefore, the Court focuses on whether these policies or practices were the moving force behind Plaintiff's constitutional violation.

Defendant argues that there is no direct link between CCSD and the sexual relationship between Vanessa, Stalmach and Dewey. The relationship between the three developed outside school, and in fact the school had previously taken steps to direct Stalmach not to maintain relationships with students outside the school setting. The Court is unpersuaded that because the relationship extended beyond the school day, or school grounds, CCSD's role in allowing for the relationship to develop between Stalmach and a female student in the first place negates its role in Plaintiff's constitutional violation.

Defendant further argues that Dewey and Stalmach never acted with a belief that CCSD would tolerate their relationship, as they told Plaintiff to keep quiet, because otherwise, they would "lose their jobs." Again, the Court is unpersuaded by this argument; the test is not whether CCSD would condone a sexual relationship between a teacher and student, but whether CCSD's customs

1  or policies of such as failing to adequately document and investigate or discipline a teacher with a

2  known and five-year history of inappropriate behavior with young female students, was a moving

3  force for one such student's constitutional violation after she engaged in sexual acts with her

4  teacher.

5        The Court finds that these policies or customs were the moving force behind Plaintiff's

6  constitutional violation because Defendant's deliberate indifference is "closely related" to

7  Stalmach's sexual abuse of Plaintiff. Oviatt, 954 F.2d at 1478. Specifically, CCSD's failures: to

8  adequately track Stalmach's history with female students, to investigate into possible leads that

9  may have led to an earlier termination of Stalmach, to have a system requiring CCSD central

10  administrative officials monitor conduct across schools, and to require each school leader to review

11  and be aware of previous incidents involving a specific employee, are closely related to Stalmach's

12  ability as a teacher for CCSD to develop an inappropriate sexual relationship with a female student,

13  Plaintiff.

14        The Court denies Defendant's motion as to Plaintiff's Section 1983 claims.

15              **C. Negligence Claim**

16                  *1. Legal Standard*

17        In Nevada, "[t]o prevail on a negligence theory, a plaintiff must generally show that: (1)

18  the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the

19  breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages."

20  Scialabba v. Brandise Const. Co., 921 P.2d 928, 930 (Nev. 1996).

21        However, N.R.S. 41.032 states, in relevant part: "[N]o action may be brought . . . against

22  an immune contractor or an officer or employee of the State or any of its agencies or political

23  subdivisions which is:. . . Based upon the exercise or performance or the failure to exercise or

24  perform a discretionary function or duty on the part of the State or any of its agencies or political

25  subdivisions or of any officer, employee or immune contractor of any of these, whether or not the

26  discretion involved is abused."

27        The Supreme Court of Nevada has adopted a two-part test, mirroring that of the

28  discretionary function exception to the Federal Tort Claims Act, to evaluate whether discretionary-

act immunity applies. <u>Martinez v. Maruszczak</u>, 168 P.3d 720, 728-29 (Nev. 2007). Under this test, certain governmental officials are immune from suit for acts or decisions that: (1) "involve an element of individual judgment or choice and (2) [are] based on considerations of social, economic, or political policy." <u>Martinez</u>, 168 P.3d at 729. Discretionary-act immunity may apply to decisions at all levels of government and even to frequent or routine decisions, "if the decisions require analysis of government policy concerns." <u>Martinez</u>, 168 P.3d at 729.

In <u>Martinez</u>, the Nevada Supreme Court stated that "immunity will likely attach under the second criterion" to actions that are integral to governmental planning or to the formulation of governmental policy, or if liability would disrupt the separation of powers or "jeopardize the quality of the governmental process." <u>Martinez</u>, 168 P.3d at 729. As an example, the Court distinguished between "the decision to create and operate a public hospital," which is entitled to discretionary-act immunity, and "a [state] physician's diagnostic and treatment decisions," which do not receive immunity as they "generally do not include policy considerations." <u>Id</u>.

"[D]ecisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." <u>Vickers v. United States</u>, 228 F.3d 944, 950 (9th Cir. 2000). Nevada finds federal decisions interpreting the FTCA's discretionary function exception to be persuasive in its interpretation of discretionary act immunity under N.R.S. 41.032. <u>See</u> <u>Martinez</u>, 168 P.3d at 727-28. The Ninth Circuit has specifically held that "the decision of whether and how to *retain* and supervise an employee, as well as whether to warn about his dangerous proclivities, are the type of discretionary judgments that the exclusion was designed to protect." <u>Doe v. Holy See</u>, 557 F.3d 1066, 1084 (9th Cir. 2009) (emphasis added).

However, there are two limitations on discretionary-act immunity. First, "N.R.S. 41.032 does not protect a government employee for intentional torts or bad-faith misconduct, as such conduct, by definition, [cannot] be within the actor's discretion." <u>Franchise Tax Bd. v. Hyatt</u>, 335 P.3d 125, 139 (Nev. 2014) (internal quotation marks omitted). Bad faith "involves an implemented attitude that completely transcends the circumference of authority granted the individual or entity. . . . Stated otherwise . . . an act of bad faith has no relationship to a rightful prerogative even if the

1   result is ostensibly within the actor's ambit of authority." <u>Falline v. GNLV Corp.</u>, 823 P.2d 888,

2   892 n.3 (Nev. 1991). Second, acts taken in violation of the constitution cannot be considered

3   discretionary. <u>Nurse v. United States</u>, 26 F.3d 996, 1002 (9th Cir. 2000) (where "the complaint

4   alleges that the policy-making defendants promulgated discriminatory, unconstitutional policies

5   which they had no discretion to create.").

6                        *2.   Analysis*

7        Defendant first argues that it is entitled to summary judgment because Plaintiff cannot

8   establish that Defendant's actions were the cause of Plaintiff's damages since Defendant had no

9   knowledge or role in Plaintiff's sexual relationship with her teacher, Stalmach. Because the Court

10  rejects this argument, finding that Plaintiff has established sufficient evidence to overcome

11  summary judgment, the Court addresses Defendant's second argument. <u>See</u> Section V(B)(2) <u>supra</u>.

12       In her SAC, Plaintiff argues that Defendant negligently retained, trained and supervised

13  Stalmach, and that it failed to warn the community at large as to the risk he posed. SAC ¶ 46. The

14  Court also construes Plaintiff's negligence claim to allege a failure to investigate prior complaints

15  against Stalmach. SAC ¶¶ 18-21. Defendant argues that it is entitled to discretionary act immunity

16  as to all of its administrators' actions regarding any investigation, discipline, retention and

17  supervision of Stalmach. In response, Plaintiff divides CCSD's actions into two categories and

18  argues Defendant is not entitled to immunity: 1) failure to investigate prior complaints and warn

19  the community of the danger Stalmach posed; and 2) "other actions." However, Plaintiff does not

20  itemize or describe which investigations or complaints were inadequate, or the "other actions"

21  catch-all, in either her Complaint or Opposition.

22       The Court finds that under clearly established Ninth Circuit law, Defendant is entitled to

23  immunity regarding Stalmach's retention, training, and supervision, as well as the Defendant's

24  failure to warn the community at large of Stalmach's alleged propensities. <u>Vickers</u>, 228 F.3d at

25  950-51; <u>Holy See</u>, 557 F.3d at 1084. Plaintiff does not allege that either of the limitations on the

26  discretionary-act immunity applies—namely, that Defendant committed an intentional tort or

27  engaged in bad faith misconduct, or promulgated an unconstitutional policy it had no discretion to

28

create. See Hyatt, 335 P.3d at 139; Nurse, 26 F.3d at 1002. Nor does Plaintiff cite to any binding case law suggesting that immunity is improper regarding these acts.

However, as discussed at the March 2016 hearing, the Court noted that the parties have not clearly identified which of Defendant CCSD's acts, particularly as it relates to the alleged failure to investigate, would be covered by discretionary act immunity. Given that Plaintiff's theory of negligence rests on a series of actions related to the Defendant's investigation, which allegedly led to the sexual act in question between Plaintiff, Dewey and Stalmach, the Court denies Defendant immunity at this time regarding the failure to investigate. Further, Defendant cites to no binding authority, nor is the Court aware of such, which broadly holds that discretionary act immunity is available for a failure to investigate in this context.

Therefore, the Court finds that Defendant CCSD is entitled to discretionary act immunity on Plaintiff's negligence claim as to all acts with the exception of the alleged failure to investigate, which will proceed forward.

## VI.   MS. DEWEY'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 94)

In her Motion, Ms. Dewey argues that summary judgment must be granted in her favor because the evidence shows that any contact between her and Vanessa was consensual, thereby defeating her assault and battery claims.

The Court rejects this motion. A reasonable jury could find that Vanessa was not capable of giving consent due to intoxication.

In Nevada, "[l]ack of consent is an essential element of the offense of assault and battery." Wright v. Starr, 179 P. 877, 878 (Nev. 1919); see also Prell Hotel Corp. v. Antonacci, 469 P.2d 399, 401 (Nev. 1970) ("Consent negates the existence of the tort" of assault and battery). However, "capacity to consent requires the mental ability to appreciate 'the nature, extent and probable consequences of the conduct consented to.'" Davies v. Butler, 602 P.2d 605, 612 (Nev. 1979) (quoting 4 Restatement (Second) of Torts § 892A cmt. b at 365). "[I]f the plaintiff is known to be incapable of giving consent because of . . . intoxication . . . his failure to object, or even his active

1   manifestation of consent will not protect the defendant." <u>Davies</u>, 602 P.2d at 605 (internal

2   quotation marks omitted).

3           Here, the evidence indicates that Vanessa consumed eight shots of whiskey and smoked

4   marijuana before engaging in sex with Mr. Stalmach and Ms. Dewey. A reasonable jury could find

5   from these facts that Vanessa lacked the mental capacity to give consent at the time Ms. Dewey

6   allegedly engaged her in sexual acts. Therefore, Defendant Dewey's Motion is denied.

7

8       **VII.    CONCLUSION**

9           Accordingly,

10          **IT IS HEREBY ORDERED** that Defendant CCSD's Motion for Summary Judgment is

11  GRANTED in part and DENIED in part. ECF No. 91.

12          **IT IS FURTHER ORDERED** that Defendant Dewey's Motion for Summary Judgment

13  is DENIED. ECF No. 94.

14

15          **DATED**: <u>August 23, 2016</u>.

16                                                              _____

17                                                              **RICHARD F. BOULWARE, II**

18                                                              **UNITED STATES DISTRICT JUDGE**

19

20

21

22

23

24

25

26

27

28